Judge Pauley

08 CV 6219

*JAMES A. SAVILLE, JR.*
*KIPP C. LELAND*
**HILL RIVKINS & HAYDEN LLP**
Attorneys for Plaintiff

45 Broadway – Suite 1500
New York, New York 10006
(212) 669-0600

*UNITED STATES DISTRICT COURT*
*SOUTHERN DISTRICT OF NEW YORK*
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

EUROGRANI S.R.L.;                                  :

                          Plaintiff,              :

          - Against -                              :

DOMINION BULK INTERNATIONAL S.A.;    :

                          Defendant.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

RECEIVED
JUL 09 2008
U.S.D.C. S.D. N.Y.
CASHIERS

Index No.:

**08 CV _____ (     )**

__VERIFIED COMPLAINT__

        Plaintiff, Eurograni S.r.l., by and through its attorneys, Hill Rivkins & Hayden LLP, as

and for its Verified Complaint against the above-named defendant alleges upon information and

belief as follows:

## JURISDICTION

1.  This is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal

    Rules of Civil Procedure and this Court has jurisdiction pursuant to 28 U.S.C. §1333 in

    that plaintiff's claim against defendant arises out of the breach of a maritime contract.

## THE PARTIES

2. At and during all material times hereinafter mentioned, plaintiff Eurograni S.r.l. ("Eurograni") was and now is a corporation existing by virtue of foreign law with an address and place of business at Via S. Valentino, 19, Gela, Italy, and was the charterer of the M/V Federal Katsura as under the charter party attached herein as Exhibit A.

3. At and during all material times hereinafter mentioned, defendant Dominion Bulk International S.A. ("Dominion") was and now is a corporation existing by virtue of foreign law with an address and place of business at 80 Broad Street, Monrovia, Liberia and owned, managed, and/or chartered out the M/V Federal Katsura.

4. This action is brought to obtain jurisdiction over the defendant and to obtain security for any judgment that is eventually entered against the defendant.

## AS AND FOR A CAUSE OF ACTION AGAINST DEFENDANT DOMINION

5. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 4 as if set forth herein at length.

6.  On or about October 8, 2007 Plaintiff chartered the M/V Federal Katsura from Defendant pursuant to a Time Charter on the New York Produce Exchange Form, a copy of which is attached herein as Exhibit A (hereinafter "Charter").

7.  Under the terms and conditions of the Charter, Defendant currently owes Plaintiff $88,099.12, which Defendant has not paid to Plaintiff, although such payment has been duly demanded.

8.  Plaintiff has duly performed all duties and obligations on its part to be performed.

9.  By reason of the premises, Plaintiff has sustained damages, and will otherwise incur costs, as nearly as same can now be estimated, no part of which has been paid, although duly demanded, in the total amount of $113,099.12.

10. After investigation, defendant cannot be "found" in this District for purposes of and as delineated in Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. Plaintiff is informed that defendant have, or will shortly have, assets within this District, including but not limited to, cash, funds, escrow funds, credits, wire transfer, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and sub-charter hire, at or being transferred and/or wired to, from or through JPMorgan Chase Bank, Citibank N.A.; American Express Bank, Ltd; Bank of America, Bank of New York, Deutsche Bank; HSB; BNP Paribas; Wachovia Bank; ABN Amro; Standard Charted Bank; Bank of Communications; The

Bank of East Asia; Bank of China; Shanghai Commercial Bank Ltd.; Bank of India and/or any other garnishee as further investigation may uncover.

**W H E R E F O R E**, plaintiff prays:

1.  That process in due form of law according to the practice of this Court may issue against defendant citing them to appear and answer the foregoing, failing which, a default will be taken against them for the principal amount of the claim, plus interest, costs and attorneys' fees;

2.  That if defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, that all assets of defendant up to and including **$113,099.12** be restrained and attached, including but not limited to cash, funds, escrow funds, credits, wire transfer, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, at or being transferred and/or wired to, from or through JPMorgan Chase Bank; Citibank N.A.; American Express Bank, Ltd; Bank of America; Bank of New York; Deutsche Bank; HSBC; BNP Paribas; Wachovia Bank; ABN Amro; Standard Chartered Bank; Bank of Communications; The Bank of East Asia; Bank of China; Shanghai Commercial Bank Ltd., Bank of India and/or other garnishees upon who a Writ of Maritime Attachment and Garnishment may be served; and

3.  And for such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       July 9, 2008

                    HILL RIVKINS & HAYDEN LLP
                    Attorneys for Plaintiff


          By: _____
                    James A. Saville, Jr.
                    Kipp C. Leland
                    45 Broadway, Suite 1500
                    New York, New York 10006
                    (212) 669-0600


29899/VERIFIED COMPLAINT

## VERIFICATION

I, Kipp C. Leland, hereby affirm as follows:

1. I am an associate with the firm Hill Rivkins & Hayden LLP, attorneys for plaintiff. I have prepared and read the foregoing Verified Complaint and know the contents thereof and, the same is true to the best of my knowledge, information and belief.

2. The sources of my knowledge, information and belief are documents provided by our clients and our discussions with them.

3. As plaintiff is a foreign corporation with no offices, officers or directors located within the Southern District of New York, this verification is made by me as counsel of record.

I hereby affirm under the penalty of perjury that the foregoing statements are true and correct.

Dated: New York, New York
       July 9, 2008

_____
          Kipp C. Leland

Exhibit A

M. Sorrentini S.p.A.                    ORIGINAL                    Copyright c 1981 and Published by: The Association
Steamship Agents – Brokers                                          of Ship Brokers & Agents (U.S.A.), Inc. (ASBA), New York.
                                                                   This derivative work may not be copied without
                                                                   the permission of the copyright owners.
                                                                   Code Name: ASBATIME

# TIME CHARTER

### New York Produce Exchange Form

**November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946; June 12th, 1981**

|  |  |  |
|---|---|---|
| | THIS CHARTER PARTY, made and concluded in *Naples* ................................ | 1 |
| | ....................8th.......... day of ..October........................... 19 *2007*.......... | 2 |
| D/Owners | between *Messrs. Dominion Bulk International S.A.- 80, Broad Street, Monrovia* | 3 |
| | *.Liberia* ............................................................................ D/Owners of | 4 |
| | the good *Panamanian flag* ~~Steamship/~~Motorship ............................... | 5 |
| Description | *"FEDERAL KATSURA" see Clause 28 and Attachment A for description of* | 6 |
| of | *vessel - all details "about" - given in good faith* .... ~~of~~ . tons gross register, and | 7 |
| Vessel | ~~horsepower and with hull, machinery and equipment in a thoroughly efficient~~ | 8 |
| | ~~state, and classed~~.................................................................*of about* | 9 |
| | .....................................~~cubic feet grain/bale capacity~~........................ | 10 |
| | ..............................................................................*and about* | 11 |
| | ~~long/metric tons deadweight capacity (cargo and~~ | 12 |
| | ~~bunkers, including fresh water and stores not exceeding~~............................ | 13 |
| | ~~long/metric tons) on a salt water draft of~~..............................~~on summer~~ | 14 |
| | ~~freeboard, inclusive of permanent bunkers, which are of the capacity of about~~ | 15 |
| | ~~long/metric tons of~~ | 16 |
| | .....................................~~fuel oil and~~.................................... | 17 |
| | ~~long/metric tons of~~.............................................................~~and~~ | 18 |
| | ~~capable of steaming, fully laden, under good weather conditions about~~ | 19 |
| | ....................~~knots on a consumption of about~~................................ | 20 |
| | ~~long/metric tons of~~ | 21 |
| | ........................................................................................ | 22 |
| | ~~now~~ ..... | 23 |
| | .................................................................................*and* | 24 |
| Charterers | *Messrs. Eurograni S.r.l.*, Via S. Valentino, 19 | 25 |
| | Charterers of the City of *Gela - Italy*.......................... | 26 |
| Duration | The Owners agree to let and the Charterers agree to hire the vessel from the | 27 |
| | time of delivery for ~~about~~ *one timecharter trip via safe port(s), safe berth(s),* | 28 |
| | *safe anchorage(s) always afloat always within Institute Warranty Limits with* | 29 |
| | *bulk/harmless grains. Loading Duluth plus eventual top off at one port St. Lawrence River.* | 30 |
| | *Duration about 30/40 days* but in any case until the completion of the voyage under | |
| | performance, within below mentioned trading limits. *Charterers option to breach Institute* | |
| | *Warranty Limits for St. Lawrence and Lakes only against payment of lumpsum* | |
| | *US$15,000.00* | |

1

| | | |
|---|---|---|
| ~~Sublet~~ | ~~Charterers shall have liberty to sublet the vessel for all or any part of the~~ | 31 |
| | ~~time covered by this Charter, but Charterers shall remain responsible for the~~ | 32 |
| | ~~fulfilment of this Charter.~~ | 33 |
| Delivery | Vessel shall be placed at the disposal of the Charterers *on exiting port limits* | 34 |
| | *Port Alfred* any time day or night, *Sundays and Holidays included.* | 35 |
| | ................................................................................................................ | 36 |
| | ................................................................................................................ | 37 |
| | ~~in such dock or at such berth or place (where she may safely lie, always afloat,~~ | 38 |
| | ~~at all times, of tide, except as otherwise provided in Clause 6 ) as the Charterers~~ | 39 |
| | ~~may direct. If such dock, berth or place be not available, time shall count as~~ | 40 |
| | ~~provided in Clause 5.~~ Vessel on her delivery shall be ready to receive cargo with | 41 |
| | clean-swept holds and tight, staunch, strong and in every way fitted for ordi- | 42 |
| | nary cargo service, having water ballast and with sufficient power to operate all | 43 |
| | cargo handling gear simultaneously ( and with full complement of officers and | 44 |
| | crew for a vessel or her tonnage), to be employed in carrying lawful merchan- | 45 |
| Dangerous Cargo | dise excluding any goods of a dangerous, injurious, flammable or corrosive | 46 |
| | nature unless carried in accordance with the requirements or recom- | 47 |
| | mendations of the proper authorities of the state of the vessel's registry and of | 48 |
| | the states of ports of shipment and discharge and of any intermediate states or | 49 |
| | ports through whose waters the vessel must pass. Without prejudice to the | 50 |
| Cargo Exclusions | generality of the foregoing, in addition the following are specifically excluded: | 51 |
| | livestock of any description, arms, ammunition, explosives *livestock, radio and* | 52 |
| | *radio-active goods and its wastes, nuclear products, petroleum and its* | 53 |
| | *products, logs, asphalt, pitch in any form, ammonium nitrate, turnings, hides,* | 54 |
| | *acids, explosives, arms, ammunitions, DRI pellets, inflammable goods,* | 55 |
| | *dangerous and injurious cargoes, creosoted goods, scrap, motor blocks,* | 56 |
| | *nuclear fuel, radio active waste, salt, concentrates, petcoke, cement,* | |
| | *cement clinker, sulphur, expellers of any kind.* | |
| | *Charterers are only permitted to carry bulk agriprods during this time* | |
| | *charter. All cargo to be loaded/carried/discharged in accordance with IMO* | |
| | *regulations. No cargo that requires CO2 fitting or mechanical ventilation is* | |
| | *permitted during this Charter.* | |
| Trading Limits | The vessel shall be employed in such lawful trades between safe ports and | 57 |
| | *always excluding Albania, Angola, Asian Gypsy Moth ports, Cabinda,* | 58 |
| | *Cambodia, Cuba, Eritrea, Ethiopia, Georgia, Haiti, Iran, Iraq, Israel, Ivory Coast,* | 59 |
| | *Jordan, Kuwait, Lebanon, Liberia, Libya, Nicaragua, Nigeria, North Korea,* | 60 |
| | *Myanmar, PG, Russian Pacific ports, Sierra Leone, Somalia, Sudan , Syria,* | 61 |
| | *Turkey, Turkish occupied Cyprus, Vietnam, Yemen, all ex Yugoslavian States,* | 62 |
| | *and countries/ports/areas sanctioned by the United Nations and war zones* | |
| | *as defined by the vessel Underwriters to be excluded,* | |
| | as the Charterers or their agents shall direct, on the following conditions: | 63 |
| Owners to Provide | 1. The Owners shall provide and pay for the insurance of the vessel and | 64 |
| | for all provisions, cabin, deck, engine-room and other necessary stores, in- | 65 |
| | cluding boiler water; shall pay for wages, consular shipping and discharging | 66 |
| | fees of the crew and charges for port services pertaining to the crew; shall | 67 |

2

maintain vessel's class *at all times with a Classification Society which is a* 68
*member of the International Association of Classification Societies* and
keep her in a thoroughly efficient state in hull,
machinery and equipment for and during the service. 69

**Charterers**    2. The Charterers, while the vessel is on hire, shall provide and pay for all 70
**to**    the fuel except as otherwise agreed, port charges, *including compulsory* 71
*security costs and* pilotage, towages, agen-
**Provide**    cies, commissions, consular charges (except those pertaining to individual 72
crew members or flag of the vessel), and all other usual expenses except those 73
stated in Clause 1, but when the vessel puts into a port for causes for which 74
vessel is responsible, then all such charges incurred shall be paid by the 75
Owners. ~~Fumigations ordered because of illness of the crew shall be for~~ 76
~~Owners' account.~~ Fumigations ordered because of cargoes carried or ports 77
visited while vessel is employed under this Charter shall be for Charterers' 78
account. All other fumigation shall be for Charterers' account after vessel has 79
been on charter for a continuous period of ~~six~~ *three* months or more. 80
        Charterers shall provide necessary dunnage and shifting boards, also 81
any extra fittings requisite for a special trade or unusual cargo, but Owners 82
shall allow them the use of any dunnage and shifting boards already aboard 83
vessel. 84

**Bunkers**    3. The Charterers on delivery, and the Owners on redelivery, shall take 85
**on**    over and pay for all fuel and diesel oil remaining on board the vessel as 86
**Delivery**    hereunder. The vessel shall be delivered with: *about 300/360.....................* 87
**and**    ~~long/metric*~~ tons of fuel oil at the price of *US$. 425.00* per *metric* ton *both ends*; 88
**Redelivery**    *about 25/35 metric* tons of diesel oil at the price of *US$ 725.00* 89
    per *metric* ton *both ends*. The vessel shall be redelivered with *about same* 90
    *quantities as on delivery .* of fuel oil at the-                    price of.US$. 91
425 per ton. same quantities as on delivery
..............................................of diesel oil at the price of ...US$. 725...............per ton 92
..................................................................................................................... 93
..................................................................................................................... 94
(* Same tons apply throughout this clause) 95

**Rate of**    4. The Charterers shall pay for the use and hire of the said vessel at the 96
**Hire**    rate of *US$. 37.600.= per day/pro rata including overtime payable every 15* 97
*days in advance to Owner's nominated bank* ~~daily or~~*in* United States Currency 98
~~per ton on vessel's total deadweight carrying capacity, including bunkers and~~ 99
~~stores, on~~ .............................................~~summer freeboard, per calendar month~~, 100
commencing on and from the ~~day~~ *hour GMT* of her delivery, as aforesaid, and at
and after 101
the same rate for any part of a *day* ~~month~~; hire shall continue until the hour *GMT* 102
~~of the~~

**Redelivery**    ~~day~~ of her redelivery in like good order and condition, ordinary wear and tear 103
**Areas and**    excepted, to the Owners (unless vessel lost) ~~at~~ *on dropping last outward sea pilot* 104
**Notices**    *Morocco or Algeria or Spanish Med or Malta or Tunisia or Italy* 105
*Savona/Manfredonia range or passing Manfredonia Southbound, or passing Cape Passaro, in*

3

*Charterers' option, any time day or night, Sundays and Holiday included* . 106

.................................................................unless otherwise mutually agreed 107

**Together with 1ˢᵗ hire, Charterers will pay a ballast bonus of US$. 722.000,00. Any cargo loaded at Duluth only exceeding MT. 18.600 or the higher quantity confirmed by the Master of Elpida, to be paid as freight at US$. 133 per MT. within 3 banking days after sailing Duluth. No extra freight charged on the top off quantity eventually loaded at St. Lawrence.**

Charterers shall give Owners not less than *15/10.*.................days notice 108

of *approximate date and probable port and 7/5/3/2/1 days definite date  and* 109

*port  vessel's expected date of redelivery and probable port* 

.................................................................................................................... 110

| | | |
|---|---|---|
| **Hire** | 5. Payment of hire shall be made so as to be received by Owners or their | 111 |
| **Payment** | designated payee in New York, i.e *INTERMEDIARY BANK, The Bank ABN-AMRO* | 112 |

*Bank – 93, Akti Miaouli Str. GR18538 – Piraeus – Greece Blc: ABNAGRAP US$. Acc. nr.* 113

*000.00.06.24.780 Iban nr. GR45 0601 0950 0000 0000 0624 780 – Correspondent bank in U.S.:*

*ABN-AMRO Bank N.Y. – New York – Swift address: ABNAUS33* 114

*FAVOUR: Messrs. Spring Hill Investment Ltd.*.in United States Currency, in funds 115

available to the Owners on the due date, *15 days semi-monthly* in advance 116

*discountless except where otherwise specified in this Charter Party or*

*agreed to by Owners,* and for the

last half month or part of same the approximate amount of hire, and should 117

same not cover the actual time, hire shall be paid for the balance day by day as 118

if becomes due, if so required by Owners. Failing the punctual and regular 119

payment of the hire, or on any breach of this Charter, the Owners shall *(subject* 120

*to Clause 38)* be at

liberty to withdraw the vessel from the service of the Charterers without pre- 121

judice to any claims they (the Owners) may otherwise have on the Charterers. 122

~~Time shall count from 7 A.M. on the working day following that on~~ 123

~~which written notice of readiness has been given to Charterers or their agents~~ 124

~~before 4 P.M. but if required by Charterers, they shall have the privilege of~~ 125

~~using vessel at once, in which case the vessel will be on hire from the com-~~ 126

~~mencement of work.~~  *First hire payment plus bunkers on delivery value plus* 127

*ballast bonus to be paid within two (2) banking days after vessels delivery and Charterers have*

*the right to deduct estimated amount of redelivery bunkers from the last sufficient hire(s) prior*

*redelivery.*

| | | |
|---|---|---|
| **Cash** | Cash for vessel's ordinary disbursements at any port *shall* ~~may~~ be | 128 |
| | advanced | |
| **Advances** | as required by the *Master* ~~Captain~~, by the Charterers or their agents, subject to | 129 |
| | 2 1/2 | |

percent commission and such advances shall be deducted from the hire. The 130

Charterers, however, shall in no way be responsible for the application of such 131

advances. 132

| | | |
|---|---|---|
| **Berths** | 6. Vessel shall be loaded and discharged in any dock or at any berth or | 133 |
| | place that Charterers or their agents may direct, provided the vessel can safely | 134 |
| | lie always afloat at any time of tide, ~~except at such places where it is customary~~ | 135 |
| | ~~for similar size vessels to safely lie aground.~~ | 136 |
| **Spaces** | 7. The whole reach of the vessel's holds, decks, and usual places of | 137 |

4

| | | |
|---|---|---|
| Available | loading ( not more than she can reasonably and safely stow and carry), also | 138 |
| | accommodations for supercargo, if carried, shall be at the Charterers' dis- | 139 |
| | posal, reserving only proper and sufficient space for ship's officers, crew, | 140 |
| | tackle, apparel, furniture, provisions, stores and fuel. *No deck cargo is permitted during this charter.* | 141 |
| Prosecution | 8. The *Master* ~~Captain~~ shall prosecute his voyages with due despatch, and shall | 142 |
| of | render all customary assistance with ship's crew and boats. The *Master* ~~Captain~~ | 143 |
| Voyages | (although appointed by the Owners) shall be under the orders and directions of | 144 |
| | the Charterers as regards employment and agency; and Charterers are to | 145 |
| | perform all cargo handling at their expense under the supervision of the | 146 |
| | ~~Captain~~ *Master and always subject to the safe trim and stability, and safety of the vessel. The Master.* who is to sign the bills of lading for cargo as presented in conformity | 147 |
| | with mate's *and*/or tally clerk's receipt. However, at Charterers' option, the Chart- | 148 |
| | erers or their agents may sign bills of lading on behalf of the *Master* ~~Captain~~ always in | 149 |
| Bills | conformity with mate's *and*/or tally clerk's receipts. All bills of lading shall be | 150 |
| of | without prejudice to this Charter and the Charterers shall indemnify the Own- | 151 |
| Ladingers | against all consequences or liabilities which may arise from any inconsis- | 152 |
| | tency between this Charter and any bills of lading ~~or way bills~~ signed by the | 153 |
| | Charterers or their agents or by the Captain at their request. *See way bills not to be issued without express prior authorisation of Owners.* | 154 |
| Conduct of | 9. If the Charterers shall have reason to be dissatisfied with the conduct of | 155 |
| Captain | the *Master* ~~Captain~~ or officers, the Owners shall, on reviewing particulars of the | 156 |
| | complaint, investigate the same, and, if necessary, make a change in the | 157 |
| | appointments. *This provision shall be without prejudice to any other rights which Charterers may have under this Charter.* | 158 |
| Supercargo | 10. The Charterers are entitled to appoint a supercargo, who shall accom- | 159 |
| and | pany the vessel and see that voyages are prosecuted with due despatch. He is | 160 |
| Meals | to be furnished with free accommodation and same fare as provided for | 161 |
| | *Master's* ~~Captain's~~ table. ~~Charterers paying at the rate of .............................. per day~~ | 162 |
| | Owners shall victual pilots and customs officers, and also, when authorized by | 163 |
| | Charterers or their agent, shall victual tally clerks, stevedore's foreman, etc., | 164 |
| | ~~Charterers paying at the rate of ................................ per meal for all such victual-~~ | 165 |
| | ~~ling.~~ *See Clause 42.* | 166 |
| Sailing | 11. The Charterers shall furnish the *Master* ~~Captain~~ from time to time with all | 167 |
| Orders | requisite instructions and sailing direction, in writing, and the *Master* ~~Captain~~ shall | 168 |
| and Logs | keep full and correct deck and engine logs of the voyage or voyages, which are | 169 |
| | to be patent to the Charterers or their agents, and furnish the Charterers, their | 170 |
| | agents or supercargo, when required, with a true copy of such deck and engine | 171 |
| | logs, showing the course of the vessel, distance run and the consumption of | 172 |
| | fuel. | 173 |
| Ventilation | 12. The *Master* ~~Captain~~ shall use diligence in *the* caring for *and in* the | 174 |

5

ventilation of the
cargo.                                                                                                                                   175

**Continuation**     13. ~~The Charterers shall have the option of continuing this Charter for a~~     176
~~further period of~~ .................................................................................................     177
...........................................................................................................................     178

**Laydays**          14, If required by Charterers, time shall not commence before.........................     179
**Cancelling**     *0001 hours October 30th , 2007* ......... and should vessel not have given written     180
notice of readiness on or before *2400 hours November 6th, 2007*....................~~but not~~     181
~~later than 4 P.M.~~ Charterers or their agents shall have the option of cancelling     182
this Charter at any time not later than the day of vessel's readiness.     183

**Off**          15. In the event of the loss of time from deficiency and/or default of officers     184
**Hire**     or crew or deficiency of stores, fire , breakdown of, or damages to , hull,     185
machinery or equipment, grounding, detention by average accidents to ship or     186
cargo unless resulting from inherent vice, quality or defect of the cargo,     187
drydocking for the purpose of examination or painting bottom, or by any other     188
similar cause preventing the full working of the vessel, the payment of hire and     189
overtime, if any, shall cease for the time thereby lost. Should the vessel deviate     190
or put back during a voyage, contrary to the order or directions of the     191
Charterers, for any reason other than accident to the cargo, the hire is to be     192
suspended *and the vessel shall be off-hire* from the time of her deviating or     193
putting back until she is again in
the same or equidistant position from the destination and the voyage resumed     194
therefrom. All fuel used by the vessel while off hire shall be for Owners'     195
account *and may be deducted from hire.* In the event of the vessel being     196
driven into port or to anchorage
through stress of weather, trading to shallow harbours or to rivers or ports with     197
bars, any detention of the vessel and/or expenses resulting from such deten-     198
tion shall be for the Charterers' account. If upon the voyage the speed be     199
reduced by defect in, or breakdown of, any part of her hull, machinery or     200
equipment, *the vessel shall be off-hire for* the time so lost, ~~and the cost of~~     201
~~any extra fuel consumed in~~
~~consequence thereof, and all extra expenses shall be deducted from the hire.~~     202
*Off-hire under this clause shall be without prejudice to any other rights*
*which Charterers may have under this Charter.*

**Total**          16. Should the vessel be lost, money paid in advance and not earned     203
**Loss**     (reckoning from the date of loss or being last heard of) shall be returned to the     204
Charterers at once.     205

**Exceptions**          The act of God, enemies, fire, restraint of princes, rulers and people     206
and all dangers and accidents of the seas, rivers, machinery, boilers, and steam     207
navigation, and errors of navigation throughout this Charter, always mutually     208
excepted.     209

**Liberties**          The vessel shall have the liberty to sail with or without pilots, to tow and     210
to be towed, to assist vessels in distress, and to deviate for the purpose of     211
saving life and property.     212

**Arbitration**          17. *This Charter shall be governed by English Law subject to*     213
*London arbitration on LMAA terms,* ~~Should~~ any dispute *or difference* ~~arise~~

6

*arising* between Owners and the Charterers *under this Charter*, ~~the matter in dispute~~ shall be referred to three persons at *London* ~~New York~~, one to be    214
appointed by each of the parties hereto, and the third by the two so chosen;    215
their decision, or that of any two of them, shall be final and for the purpose of    216
enforcing any award ~~this agreement~~ may be made a rule of the Court. The    217
arbitrators shall be commercial men conversant with shipping matters.    218
*See Clause 43.*

*The arbitration shall be conducted under the Rules of the London Maritime Arbitrators Association. Owners shall be entitled to consolidate proceedings involving related contractual disputes with third parties arising from common questions of fact or law or to have such proceedings conducted concurrently with proceedings hereunder and Charterers to undertake to cooperate with Owners in order to obtain a common arbitration panel and generally to avoid wasted or unnecessary costs. Either party shall be entitled to request the arbitration panel to deal first with issues of liability or preliminary points of construction and to issue an interim award thereon and the panel shall not refuse such a request unless in their judgement such procedure may prejudice the rights of either party.*

**Liens**    18. The Owners shall have a lien upon all cargoes and all sub-freights    219
*belonging to Charterers* for
any amounts due under this Charter, including general average contributions,    220
and the Charterers shall have a lien on the ship for all monies paid in advance    221
and not earned, and any overpaid hire or excess deposit to be returned at once.    222
Charterers will not suffer, nor permit to be continued, any lien or encumbrance    223
incurred by them or their agents, which might have priority over the title and    224
interest of the Owners in the vessel.    225

**Salvage**    19. All derelicts and salvage shall be for Owners' *sole benefit* ~~and Charterers' equal~~    226
~~benefit after deducting Owners' and Charterers' expenses and crew's propor-~~    227
~~tion.~~    228

**General**    General average shall be adjusted, according to York-Antwerp Rules    229
**Average**    1974 *as amended 1990*, ~~at such port or place in the United States as may~~    230
~~be selected by the~~
~~Owners and as to matters not provided for by these Rules, according to the~~    231
~~laws and usage at the port of New York. In such adjustment disbursements in~~    232
~~foreign currencies shall be exchanged into United States money at the rate~~    233
~~prevailing on the dates made and allowances for damage to cargo claimed in~~    234
~~foreign currency shall be converted at the rate prevailing on the last day of~~    235
~~discharge at the port or place of final discharge of such damaged cargo from~~    236
~~the ship. Average agreement or bond and such additional security, as may be~~    237
~~required by the Owners, must be furnished before delivery of the goods. Such~~    238
~~cash deposit as the Owners or their agents may deem sufficient as additional~~    239
~~security for the contribution of the goods and for any salvage and special~~    240
~~charges thereon, shall, if required, be made by the goods, shippers, consign-~~    241
~~ees or owners of the goods to the Owners before delivery. Such deposit shall,~~    242
~~at the option of the Owners, be payable in United States money and remitted to~~    243

7

~~the adjuster. When so remitted the deposit shall be held in a special account at~~ 244
~~the place of adjustment in the name of the adjusted pending settlement of the~~ 245
~~general average and refunds or credit balances, if any, shall be paid in United~~ 246
~~States money.~~ 247

**York-** Charterers shall procure that all bills of lading issued during the cur- 248
**Rules** rency of the Charter will contain a provision to ~~the effect~~ *concerning* that 249
general average *as above*

**Rules** ~~shall be adjusted according to York-Antwerp Rules 1974~~ and will include the 250
"New Jason Clause" as per Clause 23. 251

**Drydocking** 20. The vessel was last drydocked *see Clause 35*...........................~~The~~ 252
~~Owners shall have the option to place the vessel in drydock during cur-~~ 253
~~rency of this Charter at a convenient time and place, to be mutually agreed~~ 254
~~upon between Owners and Charterers, for bottom cleaning and painting~~ 255
~~and/or repair as required by class or dictated by circumstances. Payment of~~ 256
~~hire shall be suspended upon deviation from Charterers' service until vessel is~~ 257
~~again placed at Charterers' disposal at a point not less favourable to Charterers~~ 258
~~than when the hire was suspended~~.................................................................. 259
.................................................................................................................. 260
.................................................................................................................. 261

**Cargo** 21. Owners shall maintain the cargo-handling gear of the ship which is as 262
**Gear** follows:.. *see Clause 28 and Attachment A in compliance with all applicable* 263
*regulations and requirements of relevant flag and port state authorities*......... 264
.................................................................................................................. 265
providing gear (for all derricks or cranes ) capable of lifting capacity as de- 266
scribed. Owners shall also provide on the vessel for night work lights as on 267
board, but all additional lights over those on board shall be at Charterer's 268
expense. The Charterers shall have the use of any gear on board the vessel. If 269
required by Charterers, the vessel shall work night and day and all cargo- 270
handling gear shall be at Charterers ' disposal during loading and discharging. 271

**Stevedore** In the event of disabled cargo-handling gear, or insufficient power to operate 272
**Stand-by** the same, the vessel is to be considered to be off hire *as per Clause 15* ~~to the~~ 273
~~extent that~~ *for any* ~~time is~~
actually lost to the Charterers and Owners to pay stevedore stand-by charges 274
occasioned thereby. If required by the Charterers, the Owners are to bear the 275
cost of hiring shore gear in lieu thereof. *(Always understood any off-hire under* 276
*this provision shall be limited to time actually lost).*

**Crew** 22. ~~In lieu of any overtime payments to officers and crew for work ordered~~ 277
**Overtime** ~~by Charterers or their agents, Charterers shall pay Owners $~~.............................. 278
~~per month or pro rata.~~ 279

**Clauses** 23. The following clause *(or one of similar effect)* is to be included in 280
all bills of lading issued

**Paramount** hereunder *and shall be deemed to be incorporated in this Charter Party.* 281
This bill of lading shall have effect subject to the provisions of the 282
Carriage of Goods by Sea Act of the United States, the Hague Rules, or the 283
Hague-Visby Rules, as applicable, or such other similar national legislation as 284
may mandatorily apply by virtue of origin or destination of the bills of lading, 285

8

which shall be deemed to be incorporated herein and nothing herein con- 286
tained shall be deemed a surrender by the carrier of any of its rights or 287
immunities or an increase of any of its responsibilities or liabilities under said 288
applicable Act. If any term of this bill of lading be repugnant to said applicable 289
Act to any extent, such term shall be void to that extent, but no further. 290

This Charter is subject to the following clauses all of which are to be 291
included in all bills of lading issued hereunder. 292

**New**    If the ship comes into collision with another ship as a result of the 293
**Both-**    negligence of the other ship and any act, neglect or default of the master, 294
**to-**    mariner, pilot or the servants of the carrier in the navigation or in the manage 295
**Blame**    ment of the ship, the owners of the gods carried hereunder will 296
indemnify the
**Collision**    carrier against all loss or liability to the other or non-carrying ship or her 297
**Clause**owners insofar as such loss liability represents loss of, or damage to, or any 298
claim whatsoever of the owners of said goods, paid or payable by the other or 299
non-carrying ship or her owners to the owners of said goods and set off, 300
recouped or recovered by the other or non-carrying ship or her owners as part 301
of their claim against the carrying ship or carrier. 302

The foregoing provisions shall also apply where the owners, operators 303
or those in charge of any ships or objects other than, or in additional to, the 304
colliding ships or objects are at fault in respect to a collision or contact. 305

**New**    In the event of accident, danger, damage or disaster before or after 306
**Jason**    commencement of the voyage resulting from any cause whatsoever, whether 307
**Clause**due to negligence or not, for which, or for the consequences of which, the 308
carrier is not responsible, by statute, contact, or otherwise, the goods, ship- 309
per, consignees, or owners of the goods shall contribute with the carrier in 310
general average to the payment of any sacrifices, losses, or expenses of a 311
general average nature that may be made or incurred, and shall pay salvage 312
and special charges incurred in respect of the goods. 313

If a salving ship is owned or operated by the carrier, salvage shall be 314
paid for as fully as if salving ship or ships belonged to strangers. Such deposit 315
as the carrier or his agents may deem sufficient to cover the estimated con- 316
tribution of the goods and any salvage and special charges thereon shall, if 317
required, be made by the goods, shippers, consignees or owners of the goods 318
to the carrier before delivery. 319

**War**    (a) *See "Conwartime 1993" War Clause attached* ~~No contraband~~ 320
~~of war shall be shipped. Vessel shall not be re-~~
**Clauses**    ~~quired, without the consent of Owners, which shall not be unreasonably~~ 321
~~withheld, to enter any port or zone which is involved in a state of war, warlike~~ 322
~~operations, or hostilities, civil strife, insurrection or piracy whether there by a~~ 323
~~declaration of war or not, where vessel, cargo or crew might reasonably be~~ 324
~~expected to be subject to capture, seizure or arrest, or to a hostile act by a~~ 325
~~belligerent power (the term "power" meaning any dejure or de facto authority~~ 326
~~or any purported governmental organization maintaining naval, military or air~~ 327
~~forces).~~ 328
(b) ~~If such consent is given by Owners, Charterers will pay the provable~~ 329

9

~~additional cost of insuring vessel against hull war risks in an amount equal to~~ 330
~~the value under her ordinary hull policy but not exceeding a valuation of~~ 331
~~.............................................In addition, Owners may purchase and Charterers~~ 332
~~will pay for war risk insurance on ancillary risk such as loss of hire, freight~~ 333
~~disbursements, total loss, blocking and trapping, etc. If such insurance is not~~ 334
~~obtainable commercially or through a government program, vessel shall not~~ 335
~~be required to enter or remain at any such port or zone.~~ 336
         ~~(c)  In the event of the existence of the conditions described in (a)~~ 337
~~subsequent to the date of this Charter, or while vessel is on hire under this~~ 338
~~Charter, Charterers shall, in respect of voyages to any such port or zone~~ 339
~~assume the provable additional cost of wages and insurance properly incurred~~ 340
~~in connection with master, officers and crew as a consequence of such war,~~ 341
~~warlike operations or hostilities.~~ 342

**Ice**    24.  The vessel shall not be required to enter or remain in any icebound port 343
or area, for any port ~~or area where lights or lightships have been or are about~~ 344
~~to be withdrawn by reason of ice,~~ nor where there is risk that in the ordinary 345
course of things  the vessel will not be able on account of ice to safely enter and 346
remain  in  the  port ~~or area~~ or  to  get  out  after  having  completed  loading  or 347
discharging. 348

**Navigation**    25. Nothing herein stated is to be construed as a demise of  the vessel to the 349
TimeCharterers. The Owners shall remain  responsible for the  navigation of the 350
vessel,  acts  of  pilots  and  tug  boats,  insurance,  crew,  and  all  other  similar 351
matters, same as when trading for their own account. 352

**Commissions** 26.  A commission of **2,50**.............................percent is payable by the vessel 353
and Owners to ............. **to M. Sorrentini S.p.A. - Naples** 354
         ................................................ 355

on hire earned **on freight and on ballast bonus** and paid under this Charter, and also upon any 356
continuation or

extension of this Charter. **Such commission shall be deducted from hire payments.** 357
**Address**    27.  An address commission of     ...............................................percent 358
is payable to ............................................................................ 359
............. 360
on hire earned and paid under this Charter. 361

**Rider**    Rider Clauses **28 through 77, including Attachment A**........................as 362
attached hereto are incorporated in this Charter. 363


**OWNERS**                                              **CHARTERERS**


REGISTRATO A PAGINA Nº 51
REGISTRO Nº 21


(This is a computer generated Charter Party based on a NYPE Time Charter. It is a copy of the original document typed on the computer which can be modified, amended
or added to by the striking out of the original characters, or insertion of new characters such characters being clearly highlighted by the use of bold print as per the
negotiations E&OE)

*M. Sorrentini S.p.A.*

### *Rider to the Nype Time Charter Party dated Naples, 8th October 2007*

### *M/v "Federal Katsura" – Eurograni/Dominion Bulk International SA*

**Clause 28: Vessel's description**

MV. "FEDERAL KATSURA" - one page description supplied by Owners as per Attachment A.
BUIT: 2005 SHIN KURUSHIMA SHIPYARD, JAPAN FLAG: PANAMA CLASS:NKK, ICE CLASS 1D SDWT: 32,594
MT (10.67 M) DWTATLAKES:21,314 MT (8.00 M FW) HOLDS / HATCHES: 6 HATCH COVERS: MCGREGOR
FOLDING TYPE GRAIN CAPACITY: 40,490 M3 BALE CAPACITY: 38,855 M3 LOA: 190.44 M BEAM: 23.60 M
GEAR: CRANES: 3 X 30 MT 14 ON 28.5 No DMO At Sea MDO consumg during manoeuvrg In Port MDO 0.1 MT plus
2.5 MT of IFO FUEL SPECS: IFO ISO 8217 1996(E) RMG 35 AND DMB FOR MDO. ENCLOSED FULL VESSEL'S
DESCRIPTION PARTICS ALL ABOUT

Vessel is a self trimming bulk carrier

The vessel's tanktops are adequately protected against damage likely to be incurred in the carriage of heavy and/or bulk
cargoes.

Owners warrant that vessel has sufficient stability and safe trim when homogeneously loaded to full and cubic
deadweight capacity.

The vessel is fully equipped with the necessary gear and equipment required for transiting the St. Lawrence River, St.
Lawrence Seaway. Owners guarantee that vessel will comply with the Code of Best Practice for ballast water
management.

The vessel is quipped with gyro compass, radio direction finder, radar and both medium and V.H.F. radio telephone
(installed as required by the St. Lawrence Seaway Authority), all in good working order.

The vessel has been approved for grain loading under the Rules of the 1960 International Safety Convention and the
1969 grain equivalent and 1973 IMCO grain equivalent and has dispensation from trimming ends.

Vessel strengthened for carriage of heavy cargoes/alternate hold stowage
Can load deadweight cargo in alternate hold with Nos. 2 & 4 empty.

**Clause 29:      Hull Insurance**
Charterers shall be credited with any return of insurance premiums payable to Owners by Underwriters by reason of the
vessel remaining in port for such minimum period as may be provided in its insurance policies.

Any time lost on vessel and/or cargo by reason of vessel's flag, ownership, class or condition to be borne by Owners.

**Clause 30:      War Risk Insurance**
Charterers will not instruct vessel to perform a voyage involving entry into active war zones as specified by vessel's War
Risk Underwriters without Owners prior written consent. Basic War Risk Insurance for worldwide trading shall be for
Owners' account. In the event that Charterers employ the vessel in a trade for which an additional War Risk Insurance
Premium and/or Crew War Bonus is payable, Charterers shall reimburse any additional premium and/or Crew War
Bonus paid by Owners.

**ORIGINAL**

*M. Sorrentini S.p.A.*

*Rider to the Nype Time Charter Party dated Naples, 8th October 2007*

<u>*M/v "Federal Katsura" – Eurograni/Dominion Bulk International SA*</u>

**Clause 31:      P & I Club**
Owners shall throughout the term of this Charter keep the vessel entered with full cover on standard terms in a Protection and Indemnity Association ("P and I Club") which is a member of the International Group.

Owners shall promptly notify Charterers in writing of any change of P & I Club.

Charterers shall maintain insurance for Charterers' liabilities (Damage to Hull and P & I) and shall provide documentary evidence of same prior to delivery hereunder.

Charterers to have the benefit of Owner's P and I Club insofar as rules permit. Owners' P and I club: West of England

**Clause 32:      Financial Responsibility**
Owners warrant that at the time of deliver hereunder and throughout the Charter period the vessel will fully comply with all applicable conventions, statues, laws regulations and ordinances imposed by an International, National, State, Provincial, or Local Governmental Entity having jurisdiction over the vessel including without limitation the United States Federal Water Pollution Control Act, the United States Oil Pollution Act of 1990, Marpol 1973/1978 & Solas Convention 1974/1978/1983.

Without prejudice to the generality of the foregoing, Owners warrant that they will at their expense maintain and carry onboard all necessary current certificates of financial responsibility as required by all national, state, provincial and local Governments of any jurisdiction whose laws are applicable to the vessel.

Any delays, losses, damages or expenses arising from Owners' failure to comply with this clause shall be for Owners' account. Any time lost as a result of Owners' failure to comply with the requirements of this Clause shall be deemed to be off-hire and Owners shall indemnify Charterers against any losses, damages, penalties and expenses whatsoever resulting therefrom.

**Clause 33:      ITF**
Owners warrant that Officers and crew of the vessel are covered for the duration of the Charter Party by a Union Agreement(s) acceptable to ITF and that vessel will at all times carry appropriate documentary proof of the same. Any actual loss of time as a result of non-compliance with the provision of this clause shall be considered as off-hire under Clause 15.

**Clause 34:      Drugs / Contraband / Stowaways**
Owners shall indemnify Charterers and hold them harmless in respect of any claims and/or fines, and/or penalties imposed in respect of any actual or alleged present on board the vessel in the custody of crew members but not in the cargo of illegal drugs or contraband or stowaways regardless of original and undertake to provide such security upon demand as may be required to avoid detention or delay to the vessel. Any actual time lost in connection with or as a result of any actual or alleged presence of illegal drugs or contraband or stowaways on board the vessel shall count as off-hire and any costs incurred shall be for Owners' account.

Should any stowaways be found Owners will undertake to provide such security as may properly be required to avoid delays or detention of the vessel.

**ORIGINAL**

*M. Sorrentini S.p.A.*

### *Rider to the Nype Time Charter Party dated Naples, 8th October 2007*

### *M/v "Federal Katsura" – Eurograni/Dominion Bulk International SA*

Owners warrant that they have entered into a Sea Carrier Initiative Agreement with United States Customs and undertake throughout the term of this Charter to comply with all provisions of the United States Anti-Drug Act of 1986 and any amendment or re-enactment thereof.

**Clause 35:      Drydocking**
No drydocking except in case of emergency.

**Clause 36:      Stevedore Damage**
Charterers shall be liable for damage caused by stevedores to the vessel or its fittings or equipment only if the Master has given proper notice in writing to the stevedores causing such damage within 48 hours of its occurrence or in the case of hidden damages as soon as practical however in any case always by the end of the voyage concerned.

Damage affecting vessel's class or cargo/seaworthiness or the proper working of the vessel are to be repaired immediately at Charterers' time and expense. Any minor damages shall remain for occasional repair when vessel is to dock for Owners' account so that Charterers pay the actual cost of repairs but not for the time unless it exceeds the time used for vessel's Owners repairs.

**Clause 37:      Cargo Loss or Damage**
As between Owners and Charterers liability for cargo claims shall be apportioned in accordance with the Inter-Club New York Produce Exchange Agreement as amended 1996.

**Clause 38:      Punctual Payment**
Should Charterers fail to make punctual payment of hire, and such failure is due to error or omission of their bankers, Owners shall give Charterers two (2) banking days notice to rectify such failure.  If the payment in question is made within such two (2) banking days, such payment shall be deemed to have been made punctually.

**Clause 39:      Holds**
Vessel's holds on arrival first loadport to be clean,  swept and dried, free of rust, loose rust and residues of previous cargo residues and ready to load charts intended cargo: If the vessel is
rejected at loading port by Shippers' Surveyors, then vessel to be off-hire from the time of failure until relevant holds pass re-inspection, or pro rata if loading commences on passed holds. All
direct expenses caused by failure to be borne by Owners.

The vessel's cargo spaces shall not be painted during the currency of this Charter without Charterers' prior written consent which not to be unreasonably withheld.

Charterers shall have the option of redelivering the vessel with unclean holds paying Owners US$. 6.000.00 lumpsum in lieu of hold cleaning excluding removal/disposal of any dunnage/lashing materials.

**Clause 40:      Bunkers**
Charterers shall supply the vessel with IFO ISO 8217 1996 (E) RMG 35 for FO and DMO for MDO.

Charterers option to supply bunkers of greater quality than that specified in the timecharter party if that grade is not available at the intended bunkering port.

**ORIGINAL**

*M. Sorrentini S.p.A.*

### *Rider to the Nype Time Charter Party dated Naples, 8th October 2007*

### *M/v "Federal Katsura" – Eurograni/Dominion Bulk International SA*

Owners warrant that the vessel is free from United States bunkering restrictions.

Charterers may bunker in Owners time before delivery provided same does not interfere with Owner's operations.

Owners shall have the right to bunker the vessel prior redelivery provided this does not interfere with Charterers' operations.

**Clause 41:    Loading Steel Cargo**
Deleted

**Clause 42:    Communications**
Whilst on hire, Charterers shall pay Owners a lumpsum of US$1,350 per month (or pro rata), which shall cover all costs for cables, telexes, phone calls, entertainment, victual expenses and representation on Charterers' behalf. Master to send all cables/telex as requested by Charterers or Sub-Charterers. The lumpsum shall be reviewed upon request of either party if actual costs increase/decrease substantially.

**Clause 43:    Arbitration**
Where the amount in dispute is less than US$50,000 arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators' Association ("LMAA"). In the event that the parties are unable to agree upon a sole arbitrator within 14 days, either party may require the President of the LMAA to make the appointment, having regard to the general nature of the dispute(s).

**Clause 44:    On/Off Hire Bunker Survey**
Joint on/off hire bunker survey to ascertain quantity of bunkers remaining on board shall be carried out at Owners last discharge port before delivery and at Charterers last discharge port before redelivery. Joint on/off hire bunker surveys to be carried out on delivery in Owners' time and joint off hire bunker survey on redelivery in Charterers' time, but expenses to be equally shared between Owners and Charterers.

**Clause 45:    Miscellaneous**
The headings/titles used in this Charter are included for the sake of convenience only and shall be disregarded for purpose of interpretation or construction.

The failure of either party to enforce at any time any of the provisions of this Charter shall not be construed as a waiver of any of its rights. No waiver of any breach of this Charter shall be considered a waiver of any other breach whether occurring earlier or later.

**Clause 46:    ISM CODE**
From the date of coming in force of the International Safety Management ("ISM") Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the Company" (as that term is defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request, Owners shall provide a copy of the relevant Document of Compliance ("DOC") and Safety Management Certificate ("SMC").

Except as otherwise provided in this Charter Party, any loss, damage, expense or delay resulting from any failure on the part

**ORIGINAL**

*M. Sorrentini S.p.A.*

### *Rider to the Nype Time Charter Party dated Naples, 8th October 2007*

### *M/v "Federal Katsura" – Eurograni/Dominion Bulk International SA*

of the Owners or "the Company" to comply with the ISM Code, shall be for Owners' account, whether or not such consequences were reasonably foreseeable by Owners either at the date of this Charter or at the time of such failure.

**Clause 47:    Hamburg Rules**
Neither the Charterers nor their agents shall permit the issue of any Bills of Lading under this Charter voluntarily incorporating the Hamburg Rules or any legalisation under which the Hamburg Rules are compulsorily applicable on respect of any contract of carriage under or during the period of this Charter Party or any sub-Charter.

In the event that the Owners sustain a liability arising from the application of the Hamburg Rules in circumstances where those Rules or any legislation under which the Hamburg Rules are compulsorily applicable and where the Owners would not otherwise have sustained a liability then the Charterers shall indemnify the Owners for all loss and damage sustained thereby.

**Clause 48:**
In case of damage to and/or loss of cargo carried on the vessel in which Owners liability could be involved under the terms of this Charter Party, the Owners are authorizing the Charterers and/or their Operators, and/or their Agents, at the discretion of the latter parties, provided previous notice has been given to the Owners, specifically in each and every case to extend the time of suit, on their behalf beyond the statutory one year of the Hague Rules and of the relevant legislation in the countries of their enactment, it being understood that a similar extension is to be granted on behalf of the Charterers. The so granted extensions shall not prejudice the ultimate responsibility of both parties. Owners agree, that liability for cargo claims , as between Owners and Charterers, shall be appointed as specified by the Inter-Club Product Exchange Agreement effective from February 20th, 1970 as amended May 1984, 1996 and any subsequent amendments thereto.

**Clause 49:    Additional Insurance**
Any additional insurance on vessel and/or cargo levied by reason of the vessel's flag, Ownership, Class or condition to be borne by Owners.

**Clause 50:    Deratization Certificate**
Vessel to be in possession of a valid deratization certificate throughout the duration of the Charter Party.

**Clause 51:**
Vessel to be in possession of the necessary certificates to comply with safety and health regulations and all current requirements at all ports of call during the currency of this charter.

**Clause 52:    Cargo Gear Certificate**
Vessel on delivery is to be in possession of a valid and approved cargo gear certificate, in accordance with American and International cargo gear regulations.

**Clause 53:**
Vessel to work night and day and/or weekends/holidays and all gear to be at Charterers' disposal during loading/discharging. Vessel to work night and day also open and close hatches as required by Charterers. If rules of the port, or labour unions prevent the crew from opening or closing hatches, shore labour to be paid by the Charterers. Shore cranemen to be employed for Charterers' account. In the event of disabled gear or insufficient power to operate

**ORIGINAL**

*M. Sorrentini S.p.A.*

### Rider to the Nype Time Charter Party dated Naples, 8th October 2007

### M/v "Federal Katsura" – Eurograni/Dominion Bulk International SA

gear, Owners to pay for suitable substitute shore engine(s) or crane(s), and also for any stevedore standby time occasioned thereby. Hire to be reduced proportionately to the total number of working hatches, for all time the gear is unavailable due to disability or loss of power. If the vessel is detained as a result of disabled gear, and such detention or loss of time would not have occurred had the gear been available at all times, then payment o hire to be adjusted accordingly as per Clause 15.

**Clause 54:**
In the event of loss of time, delay, or impossibility of or restrictions on the full working of the ship resulting from any action that may be taken against the ship by third parties on grounds due to or connected with the country of registration of the ship, the flag flown by the ship, the terms and conditions upon which the crew of this ship (or any other vessel under same Ownership, operation or control) are engaged and employed by the Owners, or failure to comply with necessary regulations for certification at all ports, the Owners re to remain responsible for the above mentioned loss of time, delay or impossibility of or restrictions on working, and any time lost consequent upon the above mentioned action by third parties shall be considered off-hire and to be deducted from hire and any extra expenses resulting directly or indirectly from such action shall be payable and paid for by the Owners.

**Clause 55:**
If the vessel's National "Tonnage Certificate" is unacceptable to the Canadian or United Kingdom Authorities, Owner will obtain an official International Tonnage Certificate prior to delivery and any required renewals throughout the charter period, the current valid certificate being on board the vessel at all times. In the event that extra charges are incurred by reason of lack of International Tonnage Certificate they are to be for Owners' account.

**Clause 56:**
Prior to delivery of the vessel Owners are to provide Charterers (if required by them) with copies of the vessel's general arrangement and capacity plan, the hydrostatic curves and deadweight scale together with copies of the current approved grain loading plan and trimming scales to be supplied by the Master immediately upon delivery.

Vessel's plans to be available on board

**Clause 57:**
It is understood that Charterers shall be entitled at any time to carry out ultrasonic hose or other non-destructive testing of the vessel's hatch covers in order to establish their watertight integrity, and any deficiencies shall promptly be made good by Owners. The cost and item for such testing shall be borne by Charterers unless any deficiency is found, in which case any retesting to be for Owners' account and vessel to be off hire, if any time lost, until same is rectified.

**Clause 58:**
Deleted

**Clause 59:      Detention**
Damage and/or detention and/or loss of time incurred because of failure and/or inadequacy of vessel gear and/or equipment and/or personnel shall be for Owners account.

**Clause 60:      General Average**
Bunkers and hire not to contribute to general average.

**ORIGINAL**

*M. Sorrentini S.p.A.*

### Rider to the Nype Time Charter Party dated Naples, 8ᵗʰ October 2007

### M/v "Federal Katsura" – Eurograni/Dominion Bulk International SA

**Clause 61:    GMT**
Local times to apply for purposes of Clause 14 but calculation of hire under this TCP to be based on elapsed time used, that is delivery and redelivery times and dates to be Greenwich Mean Time.

**Clause 62:    Fumigation**
In the event that grain has to be fumigated aboard the vessel at any load port, Owners to permit same and vessel to remain on hire. However once holds have been closed and fumigation authorities have certified that there is no leakage of fumigant, vessel to proceed on voyage.

**Clause 63:    BILLS OF LADING**
The Charterers shall endeavour to ensure that the Master is presented with one original bill of lading prior to commencement of discharge. However in the event that this is not possible, the Owners shall instruct the Master to release the cargo against presentation to Owners Letter of Indemnity form signed by Charterers.

**Clause 64:    CUBAN TRADING**
Vessel has not traded Cuba in the last 180 days and will not do so prior to delivery under this TCP.

**Clause 65:    GYPSY MOTH**
Vessel has not traded CIS Far Eastern ports in the last two years and is free of gypsy moth infestation.

**Clause 66:    DEVIATION**
Should the vessel deviate for the purposes of saving life and/or property, any time lost and/or expense incurred to be for Owners account. The vessel is not permitted to deviate for the purposes of taking bunkers which are contrary to Charterers orders.

**Clause 67:    STOWAGE**
Deleted

**Clause 68:    GRAIN LOADING**
Vessel is approved for grain loading as required by chapter VI of Solas 1974 and its amendment, National Practice for Dispensation from Trimming Ends under regulation 9 of Solas 1974. All grain loading books manuals and certificates required by NCB/Canadian Port Warden as
applicable, current, certified and approved by necessary authorities to be aboard the vessel on arrival at all load ports or vessel to be off hire until such required documentation has been produced to NCB/Port Warden satisfaction.

**Clause 69:    SPEED AND CONSUMPTION**
The speed(s) and consumption(s) stated in this TCP are warranted by Owners to be correct but always subject to safe navigation and force majeur.

**Clause 70:    LOADING**
All grain loading stability books current and approved as necessary for loading bulk grain in Canada to be aboard the vessel on delivery.

**ORIGINAL**

*M. Sorrentini S.p.A.*

### Rider to the Nype Time Charter Party dated Naples, 8th October 2007

### M/v "Federal Katsura" – Eurograni/Dominion Bulk International SA

If a proposed cargo plan includes an empty hold or loading program other than the one pre-approved from the stability book then at Owners' time and expense an approval from the Classification Society or flag state will be required, or stresses and shearing forces must be
demonstrated to be within acceptable limits by using the on board computer program approved and endorsed by Class for grain loading, longitudinal/strength aspect and block/local stress.

**Clause 71:     BIMCO ISPS CLAUSE FOR TIME CHARTER PARTIES**

(A)     (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(B)     (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:
> "The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(C)     Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(D)     If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**Clause 72:     A I S**

Owners confirm they are aware of and will comply with IMO and St. Lawrence Seaway Authority resolutions in respect to the mandatory carriage of an automatic identification system (AIS). Vessel to be off hire for any time lost because of failure to comply with the above and any extra expenses incurred thereby to be for Owners account.

**ORIGINAL**

*M. Sorrentini S.p.A.*

## Rider to the Nype Time Charter Party dated Naples, 8th October 2007

## M/v "Federal Katsura" – Eurograni/Dominion Bulk International SA

**Clause 73:**
First hire payment plus bunkers on delivery value plus ballast bonus of US$. 722.000 to be paid within two (2) banking days after vessels delivery.

**Clause 74:**
Negotiations and fixture concluded to remain private and confidential.

**Clause 75:**
Notwithstanding Clause 24, vessel is to load in a St. Lawrence Rive port and Owners/Master to make best efforts to proceed to the place or places of loading.

**Clause 76:**    **BUNKER SULPHUR CONTENT CLAUSE**
1.   Owners warrant that the vessel shall comply with the emission control and other requirements of Regulations 14 and 18 of MARPOL Annex VI and any other laws or regulations relating to bunker specification and bunkering procedures applicable in any areas to which the vessel is ordered.
2.   Charterers warrant that they will supply bunkers:
      a.    of sufficient quantity and quality to enable the vessel to meet the emission control and other requirements of Regulations 14 and 18 of MARPOL Annex VI and any other laws or regulations relating to bunker specification and bunkering procedures applicable in any areas to which the vessel is ordered and
      b.    in accordance with the specifications in the latest version of ISO 8217 as at the time of supply and any other specifications contained elsewhere in this charter party.

**Clause 77:**    **SECURING**
Vessel able to load a full cargo of bulk wheat one grade stowing about 43 cubic feet/metric ton and proceed safely Transatlantic without securing of cargo.

**1993 WAR RISKS CLAUSE FOR TIME CHARTERS, 1993**
Code Name: "CONWARTIME "(1) For the purpose of this Clause, the words:

1. (a) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to

**ORIGINAL**

*M. Sorrentini S.p.A.*

### Rider to the Nype Time Charter Party dated Naples, 8th October 2007

### M/v "Federal Katsura" – Eurograni/Dominion Bulk International SA

leave it.

(3) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(4)

(a) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6) The Vessel shall have liberty:-

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;(b) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance; (c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;(d) to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;(e) to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter party.

**AMS Clause for Time Charter Parties / U.S. Customs Advance Notification**
a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall

**ORIGINAL**

*M. Sorrentini S.p.A.*

### *Rider to the Nype Time Charter Party dated Naples, 8th October 2007*

### <u>*M/v "Federal Katsura" – Eurograni/Dominion Bulk International SA*</u>

undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code); ii) Have in place an ICB (International Carrier Bond); iii) Provide the Owners with a timely confirmation of i) and ii) above; and iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

The Owners                                          The Charterers

**ORIGINAL**